**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| RYAN MARGULIS, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br><br>v.<br><br>ZILLOW GROUP, INC.,<br><br>   Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT - CLASS ACTION

Plaintiff Ryan Margulis ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Zillow Group, Inc. ("Defendant" or "Zillow"), and in support thereof alleges the following:

## INTRODUCTION

1. This is a class action brought against Zillow for surreptitiously intercepting the private electronic communications of visitors to its website, www.zillow.com, without their consent. Zillow knowingly directs third-party vendors, such as Microsoft Corporation, to embed snippets of JavaScript computer code ("Session Replay Code") on Zillow's website, which then deploys on each website visitor's internet browser for the purpose intercepting and recording the website visitor's private electronic communications with the Zillow website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications"). These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Zillow's request.

1

2.     After intercepting and recording the Website Communications, Zillow and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.zillow.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Zillow for analysis. Zillow's directive to the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of "looking over the shoulder" of each visitor to the Zillow website for the entire duration of their website interaction.

3.     Zillow's conduct violates the Illinois Eavesdropping Act, 720 ILCS 5/14-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*., and constitutes an invasion of the privacy rights of website visitors.

4.     Plaintiff brings this action individually and on behalf of a class of all Illinois citizens whose Website Communications were intercepted at Zillow's direction and use of Session Replay Code embedded on the webpages of www.zillow.com and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## **PARTIES**

5.     Plaintiff Ryan Margulis is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Cook county, Illinois. Plaintiff is a citizen of Illinois.

6.     Defendant Zillow Group, Inc. is corporation organized under the laws of Washington, and its principal place of business is located at 1301 Second Ave., Floor 31, Seattle Washington, 98101. Defendant is a citizen of Washington.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

8.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendant knew that its practices would directly result in collection of information from Illinois citizens while those citizens browse www.zillow.com. Defendant chose to avail itself of the business opportunities of making its real property and rental advertising services specifically available in Illinois (and specifically with respect to Illinois properties) and collecting real-time data from website visit sessions initiated by Illinoisans while located in Illinois, and the claims alleged herein arise from those activities.

9.     Zillow also knows that many users visit and interact with Zillow's websites while they are physically present in Illinois. Both desktop and mobile versions of Zillow's website allow a user to search for nearby properties by providing the user's "current location," as furnished by the location-determining tools of the device the user is using or by the user's IP address (*i.e.*, without requiring the user to manually input an address). Users' employment of automatic location services in this way means that Zillow is continuously made aware that its website is being visited

by people located in Illinois, and that such website visitors are being eavesdropped on in violation

Illinois statutory and common law.

10.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because

a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this

District.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

11.     The "world's most valuable resource is no longer oil, but data."[1]

12.     Earlier this year, Business News Daily reported that some businesses collect

personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data

(*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data

(*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data

on consumer satisfaction) from consumers.[2] This information is valuable to companies because

they can use this data to improve customer experiences, refine their marketing strategies, capture

data to sell it, and even to secure more sensitive consumer data.[3]

13.     In a consumer-driven world, the ability to capture and use customer data to shape

products, solutions, and the buying experience is critically important to a business's success.

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.
[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[3] *Id.*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

14. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

15. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

**B. Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

16. Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

---

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf.

[6] *Id.* at 25.

[7] *Id.*

[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

17. Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

18. Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

19. A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

20. Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

21. Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing

---

[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

### C. How Session Replay Code Works.

22. Session Replay Code, such as that implemented on www.zillow.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

23. While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

---

[13] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[14] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[15] *Id.*

[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

24.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

25.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

26.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

27.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide

aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

28.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

29.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

30.     Session Replay Code does not necessarily anonymize user sessions, either.

31.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

32.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

33.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

34.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [

---

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[22] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[23]

**D.     Zillow Secretly Eavesdrops on its Website Visitors' Electronic Communications.**

38.     Zillow operates the website www.zillow.com. Zillow is the "leading online residential real estate" marketplace in the United States for consumers, connecting them to the information and real estate professionals they need to buy, sell, or rent a home.[24]

39.     Zillow has become "synonymous with residential real estate."[25] www.zillow.com is the most popular real estate website in the United States, with over thirty-six million unique

---

[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[22] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.

[23] *Id.*

[24] Zillow Group, Inc., *Form 10-K* (Dec. 31, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/87bbbf30-39cb-4eb7-acdc-1b51265b9687.pdf ("Zillow 10-K").

[25] *Id.*

monthly visitors[26] and more than 135 million properties are listed on its website.[27] According to a 2021 Google Trends report, "[t]oday more people search 'Zillow' than 'real estate.'"[28]

40.     However, unbeknownst to the millions of individuals perusing Zillow's real estate listings, Zillow knowingly directs Session Replay Providers to embed various Session Replay Codes on its website to track and analyze website user interactions with www.zillow.com. Because the Session Replay Providers are unknown eavesdroppers to visitors to www.zillow.com, they are not parties to website visitors' Website Communications with Zillow.

41.     One such Session Replay Provider that Zillow procures is Microsoft.

42.     Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[29]

43.     Zillow knowingly derives a benefit and/or information from the Website Communications intercepted and recorded at its direction. Upon information and belief, Zillow uses the intercepted Website Communications to replay website visitors' interactions with www.zillow.com, improve user interactions with its website, and to provide targeted real estate advertisements to its website visitors.

44.     Zillow's knowing direction and use of Microsoft Clarity's Session Replay Code, direction and use of other Session Replay Codes through various Session Replay Providers, and its knowing derivation of a benefit and/or information from the Website Communications

---

[26] *Most Popular Real Estate Websites in the United States as of October 2021, Based on Unique Monthly Visits*, Statista, https://www.statista.com/statistics/381468/most-popular-real-estate-websites-by-monthly-visits-usa/, (last visited Sep. 8, 2022).

[27] Zillow 10-K, *supra*, note 1.

[28] *Id.*

[29] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).

surreptitiously intercepted and recorded by Session Replay Codes is a violation of Illinois statutory and common law.

### E. Plaintiff's and Class Members' Experience.

45.     Plaintiff has visited www.zillow.com on his mobile devices and computer while in Illinois.

46.     While visiting Zillow's website, Plaintiff fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.zillow.com.

47.     Unknown to Plaintiff, Zillow directs Session Replay Providers to embed Session Replay Code on its website.

48.     During the website visit, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.

49.     For example, when visiting www.zillow.com, if a website user views a certain piece of property for rent or sale, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after viewing a Studio apartment priced at $1,488 while visiting www.zillow.com.*

50.     Similarly, when visiting www.zillow.com, if a user enters personal information in a text box to schedule a tour, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—Microsoft—through a Service Replay Code—Clarity—after entering a name (purple text) to a text box to schedule a tour of a property.*

51.     The eavesdropping by the Session Replay Code is ongoing during the visit and they intercept the contents of these communications between Plaintiff and Zillow with instantaneous transmissions to the Session Replay Providers, as illustrated below, in which only 30 milliseconds were required to send a packet of even response data, which would indicate whatever the website user had just done:



52.     The Session Replay Codes operate in the same manner for all putative Class members.

53.     Like Plaintiff, each Class member visited www.zillow.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.zillow.com by sending hyper-frequent logs of those communications to Session Replay Providers.

54.     Even if Zillow masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

55.     For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves

through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

56.     As a specific example, if a user types a particular address or zip code into Zillow's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers will still learn what is entered into the bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Zillow will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the State of Illinois whose Website Communications were captured through the use of Session Replay Code embedded in www.zillow.com.

58.     Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

59.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Zillow or the Session Replay Providers.

60.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendant employed Session Replay Providers to intercept and record Zillow's website visitors' Website Communications; (b) whether Defendant operated or participated in the operation of an

16

eavesdropping device; (c) whether Defendant derives a benefit or information from the illegal use of an eavesdropping device; (d) whether Defendant directed another to use an eavesdropping device illegally on its behalf; (e) whether Session Replay Code is an "eavesdropping device" used to intercept or record private electronic communications; (f) whether Defendant acquired the contents of website users' private electronic communications without their consent; (g) whether Plaintiff and Class members had a reasonable expectation of privacy in their Website communications; (f) whether Defendant violated the Illinois Eavesdropping Act 720 ILCS 5/14-1, *et seq.*; (g) whether Defendant's interception of Plaintiff's and Class members' private electronic communications is an unfair or deceptive act or practice; (h) whether Zillow's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (i) whether Plaintiff and the Class members are entitled to equitable relief; and (j) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

61.     **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their electronic communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

62.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant

has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

63. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

64. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

65. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Zillow's books and records or the Session Replay Providers' books and records.

<u>**COUNT I**</u>
**Violation of Illinois Eavesdropping Act**
**720 ILCS 5/14-1, *et seq.***

66. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of the Class.

68.     The Illinois Eavesdropping Act (the "Act") prohibits (1) using an eavesdropping device in a surreptitious manner to overhear, transmit, or record all or any part of any private conversation; (2) intercepting, recording, or transcribing, in a surreptitious manner, any private electronic communication without consent; (3) manufacturing, assembling, distributing, or possessing any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of surreptitious overhearing, transmitting, or recording of private conversations or the intersection; or (4) using or disclosing any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication without the consent of all parties to the private electronic communication. 720 ILCS 5/14-2.

69.     Any party to any conversation or private electronic communication upon which eavesdropping was practiced shall be entitled to (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages; 720 ILCS 5/14-6.

70.     "Eavesdropping device" is defined as any "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means[.]" 720 ILCS 5/14-1(a).

71.     "Eavesdropper" is defined as "any person, including any law enforcement officer and any party to a private conversation, who operates or participates in the operation of any eavesdropping device contrary to the provisions of this Article or who acts as a principal, as defined in this Article." 720 ILCS 5/14-1(b).

72.     "Principle" is defined as "any person who: (1) knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or (2) knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or (3) directs another to use an eavesdropping device illegally on his or her behalf." 720 ILCS 5/14-1(c).

73.     "Private electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." ILCS 5/14-1(e).

74.     "Surreptitious" is defined as being "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g).

75.     Zillow is an "Eavesdropper" and "Principal" for purposes of the Act because it operates or participates in the operation of an eavesdropping device, knowingly employs another who illegally uses an eavesdropping device, derives a benefit or information from the illegal use of an eavesdropping device, and directs another to use an eavesdropping device illegally on its behalf.

76.     Session Replay Code like that operated and employed at Zillow's direction is a "eavesdropping device" used to transcribe electronic communications within the meaning of the Act.

20

77.    The Session Replay Providers are not a party to the Website Communications—Plaintiff and the Class only knew they were communicating with Zillow, not the Session Replay Providers.

78.    Plaintiff's and Class members' intercepted Website Communications constitute the private electronic communications and private conversations within the meaning of the Act.

79.    Zillow intentionally operated and employed Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' private electronic interactions communications with Zillow in real time.

80.    Plaintiff's and Class members' private electronic communications were intercepted contemporaneously with their transmission.

81.    Plaintiff and Class members had a reasonable expectation of privacy in their Website Communications based on the detailed information the Session Replay Code collected from Plaintiff and Class members.

82.    Plaintiff and Class members did not consent to having their Website Communications surreptitiously intercepted and recorded.

83.    Pursuant to 720 ILCS 5/14-6, Plaintiff and members of the Class are entitled to: (1) an injunction to prohibit further eavesdropping; (2) actual damages; and (3) punitive damages. punitive damages

84.    Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1 *et seq.***

85.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the Class.

87.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

88.     The ICFA prohibits "unfair or deceptive acts or practices," including "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2.

89.     The ICFA applies to Zillow's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

90.     Zillow is a "person" within the meaning of ILCS 505/1(c) because it is a corporation.

91.     Plaintiff and members of the Class are "consumers" within the meaning of 815 ILCS 505/1(e) because they visited www.zillow.com to shop for, purchase, or contract to purchase "merchandise"—real estate—for their own use.

92.     Zillow's advertising, offering for sale, and sale of real estate on www.zillow.com is considered "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

93.     Zillow violated the ICFA by concealing material facts about www.zillow.com. Specifically, Zillow omitted and concealed that it directed Session Replay Providers to secretly

monitor, collect, transmit, and discloses its website visitors' Website Communications to the Session Replay Providers using Session Replay Code.

94.     Zillow's direction and employment of the Session Replay Providers and their Session Replay Codes to intercept, collect, and disclose website visitors' Website Communications are material to the transactions on www.zillow.com. Zillow is leading online residential real estate marketplace in the United States and Zillow does not disclose its use of Session Replay Code to secretly monitor and collect website visitors' Website Communications. Had Plaintiff and the Class members known that the Session Replay Codes (that collect, transmit, and disclose Website Communications to the Session Replay Providers) were embedded in Zillow's website, they would not have visited www.zillow.com to shop for, purchase, or contract to purchase real estate or they would have required Zillow to compensate them for the interception, collection, and disclosure of their Website Communications.

95.     Zillow's intentionally concealed the interception, collection, and disclosure of website visitors' Website Communications using Session Replay Code embedded in www.zillow.com is material because it knows that consumers would not otherwise visit its website to search for, purchase, and contract to purchase real estate. Indeed, Zillow's concealment of such facts was intended to mislead consumers.

96.     Zillow's concealment, suppression, and omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the ICFA.

97.     By failing to disclose and inform Plaintiff and the Class about its interception, collection, and disclosure of website visitors' Website Communications, Zillow violated section 505/2 of the ICFA.

98. As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each Class member has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Zillow. The collection and use of this information has now diminished the value of such information to Plaintiff and the Class.

99. As such, Plaintiff and the Class seek an order (1) requiring Zillow to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs.

100. Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

<u>COUNT III</u>
**Invasion of Privacy – Intrusion Upon Seclusion**

101. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

102. Illinois common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in the Illinois constitution.

103. Plaintiff brings this claim individually and on behalf of the Class.

104. Plaintiff and Class members had an objective, reasonable expectation of privacy in their Website Communications.

105. Plaintiff and Class members did not consent to, authorize, or know about Zillow's intrusion at the time it occurred. Plaintiff and Class members never agreed that Zillow could collect or disclose their Website Communications.

106.    Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

107.    Zillow intentionally intruded on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

108.    Zillow's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

109.    Plaintiff and Class members were harmed by Zillow's wrongful conduct as Zillow's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

110.    Zillow's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

111.    Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

112.    Further, Zillow has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

113.    As a direct and proximate result Zillow's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

114.    Zillow's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with session replay software enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.      Certifying the Class and appointing Plaintiff as the Class representative;

B.      Appointing Plaintiff's counsel as class counsel;

C.      Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.      Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.      Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.      Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.      Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.      Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable of right.


Dated: September 8, 2022                    Respectfully submitted,


                                            /s/ Jonathan M. Jagher
                                            Jonathan M. Jagher
                                            **FREED KANNER LONDON
                                            & MILLEN LLC**
                                            923 Fayette Street
                                            Conshohocken, Pennsylvania 19428
                                            (610) 234-6486
                                            jjagher@fklmlaw.com


                                            Douglas A. Millen
                                            Michael E. Moskovitz
                                            **FREED KANNER LONDON
                                            & MILLEN LLC**
                                            2201 Waukegan Road, Ste. 130
                                            Bannockburn, IL 60015
                                            (224) 632-4500
                                            dmillen@fklmlaw.com
                                            mmoskovitz@fklmlaw.com